UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HARVEY GENE DAVIS,

      Petitioner,

v.                                   Case No.: **8:11-CV-2768-T-27AEP**

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

## ORDER

    Petitioner, an inmate in the Florida Department of Corrections proceeding *pro se*, initiated this action by filing a petition for writ of habeas corpus under 28 U.S.C. § 2254 (Dkt. 1). Petitioner challenges his conviction for second degree murder entered in 2007 in the Sixth Judicial Circuit, Pasco County, Florida. Respondent filed a response (Dkt. 7), and Petitioner filed a reply (Dkt. 14). Upon review, the petition must be denied.

**Procedural History**

    The State of Florida filed an indictment charging Petitioner with one count of first degree murder. (Dkt. 9, Ex. 1.) A jury convicted him of the lesser-included offense of second degree murder. (Dkt. 9, Ex. 12.) Petitioner was sentenced to life imprisonment as a prison releasee reoffender. (Id.) The state appellate court *per curiam* affirmed Petitioner's judgment and sentence. (Dkt. 9, Ex. 16.) Petitioner filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850, which the state court summarily denied. (Dkt. 9, Exs. 18, 19.) The state appellate court *per curiam* affirmed the order of denial on November 23, 2011. (Dkt. 9, Ex. 23.) Respondent agrees that Petitioner's federal habeas petition is timely.

**Standard of Review for Petitions Subject to AEDPA**

This petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA") effective April 24, 1996. *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Habeas relief can only be granted if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) sets forth a highly deferential standard for federal court review of a state court's findings of law and fact. It provides that habeas relief may not be granted on a claim adjudicated on the merits in state court unless such determination:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

The Supreme Court has explained this deferential standard:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Additionally, "the focus ... is on whether the state court's application of clearly established federal law is objectively unreasonable ... an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 694 (2002). *See Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the

correctness *per se*, of the state court decision that we are to decide."); *Breedlove v. Moore*, 279 F.3d 952, 961 (11th Cir. 2002) ("An unreasonable application of federal law does not refer to an incorrect or erroneous application, but rather to one that is objectively unreasonable.").

A state court's factual findings must also be given deference. A state court's determinations of fact "shall be presumed to be correct," and the habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Henderson v. Campbell*, 353 F.3d 880, 890-91 (11th Cir. 2003).

**Exhaustion of State Remedies**

Before a district court can grant habeas relief to a state prisoner under § 2254, the petitioner must exhaust all state court remedies that are available for challenging his conviction, either on direct appeal or in a state postconviction motion. *See* § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). *See also Henderson,* 353 F.3d at 891 ("A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts.") (citations omitted). A state prisoner "'must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the state's court of last resort, even if review in that court is discretionary." *Pruitt v. Jones*, 348 F.3d 1355, 1358-59 (11th Cir. 2003) (quoting *O'Sullivan*, 526 U.S. at 845.)

To exhaust a claim, a petitioner must make the state court aware of both the legal and factual bases for his claim. *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) ("Exhaustion of state remedies requires that the state prisoner 'fairly presen[t] federal claims to the state courts in

order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'") (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)).  A federal habeas petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State ... if he has the right under the law of the State to raise, by any available procedure, the question presented."  28 U.S.C. § 2254(c); *Pruitt*, 348 F.3d at 1358.  The requirement of exhausting state remedies as a prerequisite to federal review is satisfied if the petitioner "fairly presents" his claim in each appropriate state court and alerts that court to the federal nature of the claim.  28 U.S.C. § 2254(b)(1); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).

**Standard of Review for Claims of Ineffective Assistance of Counsel**

Claims of ineffective assistance of counsel are reviewed under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  To obtain relief under *Strickland*, a petitioner must show that counsel's performance was deficient and that this deficiency prejudiced the petitioner.  *Id*. at 687.  In order to show deficient performance, a petitioner must demonstrate that "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance."  *Id*. at 690.  To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

Counsel is presumed to have provided effective assistance.  *See id.* at 689-90.  Further, "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  *Id*. at 690. Sustaining a claim of ineffective assistance of counsel is difficult because "[t]he standards created

by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review

is 'doubly' so." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citations omitted). If a court can

dispose of a claim of ineffective assistance of counsel on one prong of the *Strickland* test, the court

need not consider the other prong. *See Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998).

**Discussion**

I.     *Factual Background*

Petitioner was charged with murdering his girlfriend, Deborah Lynn Fossett, on or between

June 28, 2004, and June 29, 2004. (Dkt. 9, Ex. 1.) Petitioner and Fossett lived together in Fossett's

house on Beachwood Drive in New Port Richey, Florida. Responding to a 911 call, law enforcement

found Fossett's body in the home during the early morning hours of June 29, 2004. Petitioner was

taken into custody the same day.

Petitioner's brother, Joe Wells, and Petitioner's sister, Sonia Davis,[1] testified at trial about

their interactions with Petitioner on June 28, 2004. They went to Petitioner's house during the

afternoon. (Dkt. 9, Ex. 24, Vol. I, pp. 147, 164-66.) After Sonia drove Joe and Petitioner to a

convenience store, she dropped them off back at the house. (Id., pp. 148, 170, 173.) That evening,

at approximately 6:00 or 7:00 p.m., Fossett and Petitioner drove Joe to Sonia's house and dropped

him off there. (Id., p. 149.) Fossett drove a silver Nissan SUV. Fossett and Petitioner took her

vehicle when they drove Joe to Sonia's house. (Id., pp. 173-74, 76.)

---

[1]Sonia Davis was called as a State witness but was reluctant to testify against Petitioner. A review of her trial testimony reflects that she frequently responded to questions by indicating that she did not remember or did not know. Therefore, the prosecutor often referred to her grand jury testimony and her statements to law enforcement to impeach her. When presented with this information, Sonia Davis typically acknowledged making the prior statements and indicated that those prior statements would have been accurate. Therefore, portions of the factual background section of this order that discuss Sonia Davis's testimony represent a summary of the evidence accepted by the state trial court through Sonia Davis's trial testimony, as well as her grand jury testimony and statements to law enforcement also introduced at trial.

Later, at approximately 9:00 p.m., Petitioner and Fossett picked up Mark King when he finished work. (Dkt. 9, Ex. 24, Vol. III, p. 438.)[2] They picked him up in Fossett's vehicle. (Id.) When King got in, Petitioner and Fossett were arguing. (Id., pp. 438-39.) King heard Fossett tell Petitioner that she wanted him out of the house by the next day. (Id., p. 439.)

Testimony then focused on events that took place later during the night. Nita Wells, another sister of Petitioner, testified that Petitioner came to her home in Hudson near midnight. (Dkt. 9, Ex. 24, Vol. II, pp. 237-38, 240.) Nita lived there with her children, and her mother sometimes stayed there. (Id., p. 237.) Petitioner knocked on the front door, but Nita did not let him in because her children were sleeping. (Id., pp. 238-39.) She looked outside and saw a Nissan SUV. (Id., p. 239.) Similarly, Sonia Davis also testified that after she fell asleep sometime past midnight on June 28, 2004, she was woken up by Petitioner knocking at the door. (Dkt. 9, Ex. 24, Vol. I, pp. 180-82.) Her boyfriend, Joshua Burton, who was staying with her, also testified to this effect. (Id., pp. 130-32.) They did not answer the door for Petitioner, but they saw him leave in a silver SUV. (Id., pp. 132-33, 184-86.)

Later that night, Sonia received a phone call. Although she did not answer the phone when it rang, after checking her voice mail, she called Petitioner back at approximately 1:55 a.m. (Id., pp. 134, 186-89.) Petitioner answered and said that he wanted Sonia to come over. (Id., pp. 190-91.) Sonia thought that Petitioner's voice did not sound right. (Id., p. 192.) She indicated to Burton that she had to go see her brother or see what was wrong. (Id., p. 134.)

Upon arriving at the house, Sonia saw Petitioner on the porch. (196.) Petitioner told her that

---

[2]Mark King had been in a relationship with Fossett's daughter, Sarah. Sarah Fossett and Mark King previously lived at Fossett's house with Fossett and Petitioner. (Dkt. 9, Ex. 24, Vol. III, pp. 429, 437.)

Fossett was dead or hurt. (198-99.) Sonia looked through the window and saw a shadow or silhouette. (Dkt. 9, Ex. 24, Vol. II, pp. 205-06.)[3] As Sonia Davis went on to explain in her statement to Detective James Medley of the Pasco County Sheriff's Office, Sonia did not "know if it was her because it was dark. I seen a person in the chair facing the window, and I just backed up. I started backing up out of the driveway to get into the car." (Id., pp. 207-08.) After Sonia went to her car, Petitioner came to the other side of the car and the two talked. (Id., pp. 209-11.)

Petitioner told Sonia about an argument he had with Fossett. (Id., p. 214.) As Sonia recounted in her statement to Detective Medley, Petitioner said that "they were arguing. They had a fight. They were arguing and she wouldn't let up. She wouldn't stop. She told him to leave. She told him he had to leave. He had to be out. And she wouldn't let up. She wouldn't let up." (Id., pp. 214-15.) Petitioner said to Sonia that he choked Fossett. (Id., pp. 215-17.) When Detective Medley interviewed her, Sonia indicated that she was fairly certain that Petitioner said he choked Fossett. (Id., pp. 218-19.) After Petitioner told her this, Sonia got into her car because she was scared. (Id., p. 219.) She left and eventually returned home. (Id., pp. 219-220.)

Detective Medley testified at trial and reiterated much of Sonia Davis's testimony about her interactions with Petitioner on the night of the murder. Detective Medley first spoke with Sonia Davis when he responded to her home on June 29, 2004, and also interviewed her at the police station later that day. (Id., pp. 255, 272-73.) Detective Medley recounted Sonia's statements to him that Petitioner came to her house during the night but she did not answer the door, that Sonia later received a message from Petitioner indicating that he wanted her to come over, and that she went to his house. (Id., pp. 273-75.)

---

[3]Testimony from responding law enforcement officers reflects that Fossett's body was found in a seated position in a chair near a window that was covered with sheer curtains. (Dkt. 9, Ex. 24, Vol. I, pp. 40-41, 44, 47-48, 60-62.)

Detective Medley also testified that Sonia stated that when she arrived at the house, Petitioner indicated that Fossett was hurt or was dead, and that when she looked into the residence she saw, through the sheer curtains, a body facing the window.  (Id., p. 276.)   Detective Medley further testified to Sonia's statements that Petitioner told her that "Deb's dead," and that Petitioner admitted to choking Fossett.  (Id., pp. 277-79.)  Sonia also told Detective Medley that Petitioner said there had been an argument, that Fossett wanted him out of the house and told him to pack up and leave, and that Fossett would not "stop" or "let up."  (Id., pp. 277-78.)

Joshua Burton testified that when Sonia came home, she told him that "her brother said that he possibly hurt her or killed her."  (Dkt. 9, Ex. 24, Vol. I, p. 139.)[4]   Burton told Sonia she should call 911.  (Id.)  Sergeant Bryan Gardner of the Pasco County Sheriff's Office[5] also testified to this matter.  During Sergeant Gardner's interview of Burton on June 29, 2004, Burton stated that when Sonia returned from Petitioner's house, she indicated that something was going on at the house, and that her brother might have hurt or killed Fossett.  (Dkt. 9, Ex. 24, Vol. II, pp. 295-96, 301.)  Sergeant Gardner testified that, according to Burton, Petitioner told Sonia what had happened.  (Id., pp. 301-02.)

As Burton suggested, Sonia called 911.  A tape of the 911 call she placed was played for the

---

[4]Burton initially indicated that when Sonia returned, she said that she thought Fossett was hurt or that Petitioner possibly killed her, but that Sonia did not say that Petitioner actually told her this information himself.  (Dkt. 9, Ex. 24, Vol. I, pp. 135-36.)  However, Burton testified that his memory was much better when he talked to Detective Bryan Gardner at the time about Sonia's statements, and that his statements to Detective Gardner would have been accurate. (Id., pp. 137, 138.)  Therefore, after reviewing Detective Gardner's report, Burton testified that Sonia Davis said that Petitioner told her that he possibly hurt or killed Fossett.  (Id., p. 139.)  Burton further acknowledged on cross-examination that, due to the passage of time, he was "going by" the summary of his statements contained in the police report.  (Id., p. 142.)

[5]For purposes of clarity, it is noted that at the time of trial, Bryan Gardner held the position of Sergeant and identified himself that way during his testimony, but Joshua Burton's testimony refers to him as Detective Gardner because he held the position of Detective at the time of the investigation.  (Dkt. 9, Ex. 24, Vol. II, p. 295.)

jury. Sonia agreed that it was her voice on the tape.  (Id., p. 222.)   During the 911 call, Sonia stated that her brother called her and said he hurt someone.  (Dkt. 9, Ex. 24, Vol. I, pp. 100-101; Dkt. 9, Ex. 24, Vol. II, p. 221.)  She further stated that her brother and Fossett lived on Beachwood, and indicated that she needed to go to their house.  (Dkt. 9, Ex. 24, Vol. I, p. 101; Ex. 24, Vol. II, p. 222.)

After the 911 call, law enforcement responded to Petitioner and Fossett's house.  When Sergeant Dale Mann of the New Port Richey Police Department arrived, another officer informed him that the victim's SUV was gone, and Sergeant Mann put out a BOLO for the SUV.  (Id., p. 104-05.)  In the meantime, Petitioner returned to Nita Wells's house at approximately 3:00 a.m.  (Dkt. 9, Ex. 24, Vol. II, p. 240.)  Petitioner asked to talk with Nita's mother, but Nita refused to let him into the home.  (Id., pp. 240-41.)  Petitioner left after Nita told him that her mother was at Sonia's house.  (Id., p. 242.)

 Sergeant Mann and Officer Arthur Madden of the New Port Richey Police Department proceeded to Sonia Davis's house sometime after 3:00 a.m. on June 29, 2004.  (Dkt. 9, Ex. 24, Vol. I, pp. 104-05, 122.)  Sonia told Sergeant Mann that Petitioner stated that he did something bad to Fossett.  (Dkt. 9, Ex. 24, Vol. II, p. 389.)  Sergeant Mann and Officer Madden were then talking outside of the home when a silver SUV that looked like Fossett's vehicle approached and came close to them before crashing into the house.  (Dkt. 9, Ex. 24, Vol. I, pp. 106-07, 123-24.)  Petitioner was the sole occupant of the vehicle.  (Id., pp. 108-110.)  Officers removed Petitioner from the vehicle and handcuffed him.  (Id., pp. 109, 125.)  Petitioner was then taken to the New Port Richey Police Department.  (Id., pp. 110, 118-19, 125.)

Law enforcement interviewed Sonia Davis and Joshua Burton on June 29, 2004.  Several officers testified about statements made to them by Sonia and Joshua Burton that day.  As previously

addressed, Detective Medley spoke to Sonia twice, and Sergeant Gardner spoke to Burton. Sergeant Gardner also interviewed Sonia, and in the course of the interview, he looked at her phone. (Dkt. 9, Ex. 24, Vol. II, p. 303.) He was able to determine that a call was made from Fossett's number to Sonia's phone at 1:41 a.m. (Id., pp. 303-04.)

Detective Eric Seltzer of the Pasco County Sheriff's Office interviewed Petitioner on June 29, 2004. (Id., p. 311.) Detective Seltzer testified that Petitioner reported that the previous night, Fossett picked him up from work and they went home. (Id., p. 317.) Petitioner said that he later took Fossett's car and left her house at sundown, which would have been at approximately 8:00 to 8:30 p.m. (Id., pp. 317, 319.) Petitioner told Detective Seltzer that he drove to visit Nita Wells in Hudson but that she would not answer the door for him. (Id., pp. 319-20.) Petitioner told Detective Seltzer that he went to Sonia's house, where he was arrested. (Id., p. 320.)

Detective Seltzer testified that, as Hudson was only twenty or thirty minutes from Petitioner's house, he asked Petitioner to explain what he was doing during the time between leaving the house at about 8:30 p.m. and being arrested at around 3:00 a.m. (Id.) Petitioner responded that he was driving around, but Detective Seltzer testified that Petitioner could not describe where he was or what he was doing other than to say that he got lost and then pulled up to Sonia's house and was arrested. (Id.) Petitioner told Detective Seltzer that he had not spoken with Sonia Davis earlier and had not returned to his house after leaving at sundown. (Id., pp. 320, 321.) Detective Seltzer testified that during the interview, Petitioner asked whether something happened to Fossett and whether someone beat her up. (Id., p. 321.) This remark was spontaneous and not in response to any question. (Id.) When Detective Seltzer asked him what happened that night, Petitioner responded to ask his sister Sonia. (Id., p. 323.)

Page 10 of 25

Trial testimony also concerned physical evidence and findings.  Dr. Christopher Wilson, the associate medical examiner who performed the autopsy on Fossett, testified that her cause of death was asphyxiation.  (Id., pp. 375, 381.)[6]  Florida Department of Law Enforcement crime lab analyst Darren Esposito testified that DNA obtained from Fossett's fingernail clippings matched Petitioner's DNA.  (Id., p. 396; Dkt. 9, Ex. 24, Vol. III, pp. 407-08.)[7]  Susan Miller, a forensic investigator with the Pasco County Sheriff's Office, testified that on June 29, 2004, she observed scratch marks on Petitioner's back, and that the marks appeared to be recent.  (Dkt. 9, Ex. 24, Vol. III, pp. 412-13.)

Additionally, the jury heard about a 911 call made by Fossett the month prior to her death.  Ann Cook, a retired police dispatcher and former co-worker of Fossett,[8] testified that on May 7, 2004, she received a 911 call from Fossett.  (Dkt. 9, Ex. 24, pp. 445-47.)  When Cook answered the call, the person on the other end was coughing and choking.  (Id., p. 447.)  When the person was able to speak, Cook recognized the voice as belonging to Fossett.  (Id., p. 447-48.)  Fossett told Cook that Petitioner woke her up choking her but that she fought him off.  (Id., p. 448.)

The jury also heard testimony concerning Petitioner's subsequent statements.  William McKenna testified that during his incarceration in the Pasco County Detention Center, he frequently talked with Petitioner.  (Dkt. 9, Ex. 24, Vol. II, pp. 343, 348.)  McKenna testified that Petitioner stated he had a fight with his girlfriend, and that Petitioner said he "didn't remember what happened"

---

[6]Dr. Wilson also testified that Fossett had numerous contusions or bruises on her body.  (Dkt. 9, Ex. 24, Vol. II, 375.)  Dr. Wilson conceded on cross-examination that it is possible that death from asphyxiation could occur due to a variety of reasons.  (Id., p. 387.)

[7]Esposito acknowledged that it could not be determined when the DNA was transferred to Fossett's fingernails. (Dkt. 9, Ex. 24, Vol. III, p. 411.)

[8]Fossett was a dispatcher for the New Port Richey Police Department.  (Dkt. 9, Ex. 24, Vol. I, pp. 35-36, 103-04.)

but that "when he came to, he was on top of his girlfriend and he was choking her."  (Id., p. 350.)

McKenna further testified that Petitioner stated he became frightened and left the house with a

vehicle, and hoped that the police would think someone else burglarized the house and murdered his

girlfriend.  (Id.)[9]

## II.    Petitioner's Claims

### Ground One: "Deprivation of Right Secured by the 6th and 14th Amendments, Counsel Failed to Object to Prosecutorial Misconduct."

Petitioner argues that counsel was ineffective for failing to object when the prosecutor

vouched for the credibility of State witnesses Sonia Davis and William McKenna.  Petitioner raised

this claim in ground one of his Rule 3.850 motion.[10]   In evaluating this ground, the state court

---

[9]McKenna testified that he had a pending charge and that he had been convicted of seventeen prior felonies. (Dkt. 9, Ex. 24, Vol. II, p. 343.)  He testified that when he spoke with law enforcement about what Petitioner told him, he was not threatened or offered anything.  (Id., p. 351.)  He indicated that he told law enforcement of Petitioner's statements because he did not want to "keep doing wrong."  (Id., p. 352.)  He said he was testifying because he thought it was the right thing to do.  (Id., pp. 354-55.)  On cross-examination, McKenna acknowledged that he had been a "jailhouse informant" in two other murder trials, and was facing a charge of armed robbery punishable by up to life in prison.  (Id., pp. 355-56.)  When McKenna reiterated that he was testifying because he wanted to do the right thing, defense counsel asked him to confirm that a potential life sentence did not have any bearing on his actions, and McKenna stated, "Possibly could help me," and "Hopefully."  (Id., pp. 357-58.)  On re-direct examination, McKenna stated that he hoped a judge sentencing him in the future would look favorably upon his testimony against Petitioner, as well as his testimony in the two other cases.  (Id., p. 363.)

[10]In his Rule 3.850 motion, Petitioner referred to the following portions of the prosecutor's closing argument in support of his claim. (Dkt. 9, Ex. 18, pp. 2-3.) As to Sonia Davis's grand jury testimony and statements to Detective Medley and Sergeant Mann, the prosecutor stated, "Folks, it's truthful.  This is all you need.  Sonia Davis.  Reliable nothing.  She's as reliable as the day is long." (Dkt. 9, Ex. 24, Vol. III, p. 495.)  Regarding her statements to Detective Medley that she became frightened and left Petitioner's house after he told her he choked Fossett, the prosecutor contended that, "Those are the statements Sonia makes hours after this event occurs, which I submit to you is truthful. It's a time in her life where she realizes she better tell the truth." (Id., p. 492.)  The prosecutor also argued that,"You could gather from her demeanor ... what type of person she was.  A truthful person ...."  (Id., p. 494.) As to William McKenna, the prosecutor stated:

> Ask yourself, if he was going to make up a story, wouldn't he make up a better story.  Wouldn't he say the defendant planned this out, that this was a premeditated killing, that he knew exactly what he was doing, that she had told him to get out of the house and he refused to get out.  And she told him, I'm throwing you out.  Why didn't McKenna make all that up?  Why?  Because it's truthful.  He's telling us what he heard from this defendant.

(Id., p. 504.)

conducted a thorough review of the evidence of Petitioner's guilt presented at trial.  (See Dkt. 9, Ex. 19, pp. 3-4.)[11]  The court also surmised that Sonia Davis could not have known within hours of the murder that the victim was choked, as she told Detective Medley, had Petitioner not informed her of this.  (Dkt. 9, Ex. 19, p. 3.)  The court further concluded that Detective Seltzer's testimony indicated Petitioner was unable to account for his whereabouts during a span of approximately six hours on the night of the murder.  (Dkt. 9, Ex. 19, p. 4.)  Based on the totality of this evidence, the state court found that Petitioner could not make the necessary showing of prejudice:

> [B]ecause of the overwhelming evidence of guilt in this case, it cannot be said that the Defendant was prejudiced by the prosecutor's statements. *Singletary v. State* 483 So. 2d 8, 10 (Fla. 2d DCA 1985) ("the question on this regard boils down to whether the evidence of guilt was so overwhelming as to justify a conclusion that defendant was not improperly prejudiced and that the error was harmless").

(Dkt. 9, Ex. 19, p. 4.)

The record supports the state court's conclusion that Petitioner did not show that he was prejudiced by counsel's failure to object during the prosecutor's closing argument.  The state court's summary of the testimony and facts brought out at trial reflected a comprehensive review of the record and the evidence of Petitioner's guilt.  The state court found that, taking all this evidence into account, Petitioner did not demonstrate that he was prejudiced by counsel's failure to object.[12]

---

[11]This review included a description of much of the evidence discussed in the factual background section of this Order, including facts drawn from the testimony of Sonia Davis, Detective James Medley, Joshua Burton, Sergeant Bryan Gardner, Sergeant Dale Mann, William McKenna, Mark King, Ann Cook, Darren Esposito, Susan Miller, Dr. Christopher Wilson, and Detective Eric Seltzer.

[12]The state court's denial was based on its finding that Petitioner did not show prejudice under *Strickland*.  It is noted that it is not apparent that Petitioner demonstrated deficient performance by counsel for failing to object. "Improper bolstering occurs when the State places the prestige of the government behind the witness or indicates that information not presented to the jury supports the witness's testimony." *Williamson v. State*, 994 So.2d 1000, 1013 (Fla. 2008) (quoting *Hutchinson v. State*, 882 So.2d 943, 953 (Fla. 2004)).  However, prosecutorial comments concerning a witness's credibility may be a fair reply if made in response to a defense challenge to the witness's credibility.  *See Williamson*, 994 So.2d at 1013.  Here, the prosecutor's comments were made after defense counsel presented his initial closing argument, in which he argued that the State used unreliable witnesses to support its case.  In the context of this argument, defense counsel brought up Sonia Davis's reluctance to testify and the difficulties with obtaining answers from her.  He also referred to William McKenna's previous felony convictions and McKenna's testimony indicating that he was facing a life sentence but he was testifying because he wanted to do what was right.  (Dkt. 9, Ex. 24, Vol. III, pp. 476-79.)

Petitioner argues that the state court's ruling was erroneous because its summary of the evidence included testimony from the very witnesses whose credibility was vouched for by the prosecutor.  He also claims that the state court erred in finding that the evidence against him was overwhelming.  Specifically, he contends that the evidence was not overwhelming because it involved hearsay statements of Sonia Davis and Joshua Burton, unreliable testimony of Mark King, self-serving testimony of William McKenna, and circumstantial DNA evidence.  Petitioner raised these assertions on appeal of the order denying his Rule 3.850 motion.  (Dkt. 9, Ex. 22, pp. 3-4, 7-10.)  The state appellate court *per curiam* affirmed the order of denial.[13]  Therefore, these claims have been reviewed and rejected by the state appellate court.  The state appellate court's *per curiam* affirmance warrants deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore,* 278 F.3d 1245, 1254 (11th Cir.), *reh'g and reh'g en banc denied,* 278 F.3d 1245 (2002), *cert. denied sub nom Wright v. Crosby,* 538 U.S. 906 (2003).  *See also Harrington v. Richter,* 131 S.Ct. 770, 784–85 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

Additionally, even assuming the prosecutor's statements were improper, Petitioner fails to demonstrate that these remarks affected the jury's consideration of the testimony as presented by the witnesses themselves such that there is a reasonable probability that the outcome of trial would have

---

[13]It does not appear that the State filed an answer brief.

been different.   Accordingly, this argument fails to demonstrate prejudice under *Strickland*.[14]

Furthermore, a review of the trial transcript supports the state court's finding that the evidence of

Petitioner's guilt, which included his own incriminating statements, was overwhelming.

The record supports the state court's conclusion that Petitioner failed to show that he was

prejudiced by counsel's failure to object to the prosecutor's statements concerning Sonia Davis and

William McKenna.   Petitioner has not demonstrated that the court's finding was contrary to or an

unreasonable application of clearly established federal law.   Consequently, he is not entitled to relief

on Ground One.

**Ground Two: "Deprivations of Rights as Secured by the 6th and 14th Amendments, Counsel
Failed to Depose Witness Mark King."**

Petitioner contends that counsel provided ineffective assistance when he failed to depose

State witness Mark King.   King testified that when Petitioner and Fossett picked him up from work

at approximately 9:00 p.m. on June 28, 2004, the night of the murder, they were arguing and Fossett

said she wanted Petitioner out of the house.   King testified at the March 2007 trial that he had been

living in Georgia for about four years.   Based on this time frame, Petitioner asserts that King must

have moved to Georgia prior to the murder.   Petitioner therefore argues that King could not have

been in Pasco County on June 28, 2004, and that the events about which he testified actually took

place sometime in 2003.   Petitioner contends that counsel would have known this information had

he deposed King.

Petitioner raised this claim in ground two of his Rule 3.850 motion.   The postconviction

---

[14]Furthermore, the jury was instructed that it was their decision what evidence was reliable, that they should consider their observations of the witnesses in evaluating witnesses, and that they could rely upon their own conclusions about witnesses and could believe or disbelieve any part or all of the evidence or the testimony of witnesses. (Dkt. 9, Ex. 24, Vol. III, pp. 556-57.)

court's order noted that the State used King's testimony to counter Petitioner's statement to police that he went home with Fossett but then left the house at 8:00 or 8:30 p.m. in Fossett's vehicle. The state court denied Petitioner's argument, finding that he did not demonstrate prejudice as a result of counsel's performance due to the overwhelming evidence of guilt: "However, even without the testimony of King, there is overwhelming evidence of guilt as more fully explained in Ground 2 [sic]. Accordingly, Defendant cannot establish prejudice and this claim is, therefore, denied." (Dkt. 9, Ex. 19, p. 5.) This portion of the state court's order refers to its earlier discussion of the evidence of guilt presented at trial. The record supports the state court's finding that Petitioner has not shown that he was prejudiced by counsel's decision not to depose King, given the overwhelming evidence against Petitioner.

Furthermore, Petitioner has not offered any evidence showing that King was in fact in another location on the night of the murder or that King's trial testimony was incorrect. King's statement about the amount of time he had lived in Georgia was an approximation, and he testified that he was living in New Port Richey, in Pasco County, on June 28, 2004.[15] Therefore, this claim of ineffective

---

[15] The following exchange took place during the State's direct examination of King:

Q       How long have you lived in Columbus, Georgia?

A       Back there about four years now.

Q       And I want to go back to June of 2004. Okay. Were you living here, in Pasco County?

A       Yes.

Q       On specifically June 28th of 2004, do you recall where you were living?

A       I was living - - I can't remember the street. It was in New Port Richey, in an apartment complex.

(Dkt. 9, Ex. 24, Vol. III, pp. 436-37.)

assistance of counsel is based on conclusory and unsubstantiated assertions, which cannot provide federal habeas relief. *See Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (recognizing that vague, conclusory, or unsupported allegations cannot support an ineffective assistance of counsel claim).

Additionally, critical portions of King's testimony were cumulative to other trial testimony. The jury heard from other witnesses that Petitioner and Fossett were together on the night of the murder, and that they had been arguing. Specifically, the testimony from Sonia Davis and Joe Wells that Petitioner and Fossett drove Joe to Sonia's house on the evening of June 28, 2004, placed Petitioner and Fossett together prior to the murder. Sonia Davis also testified that when she went to Petitioner's house in the early morning hours of June 29, 2004, Petitioner told her that he and Fossett had been arguing and that Fossett wanted him to leave. This point was reiterated in Detective Medley's testimony. McKenna also testified that Petitioner told him he had a fight with his girlfriend and choked her. Therefore, key aspects of King's testimony were also put before the jury by other witnesses.

Moreover, even assuming that King's testimony, used to contradict Petitioner's statement that he left the house around 8:00 or 8:30 p.m., was incorrect, Petitioner cannot demonstrate entitlement to relief. Such an inaccuracy would be irrelevant as to the evidence of guilt presented at trial. Regardless of whether Petitioner left the house at the time he claims he did, Sonia Davis's testimony was clear that Petitioner returned to the house later that night. This further supports the state court's finding that Petitioner failed to show that he was prejudiced by counsel's performance.

Finally, Petitioner refers to the State's closing argument in support of his contention that King's testimony was used to provide "a context, false though it was, within which the rest of the

State's case could be accepted as credible and Petitioner's statements to the investigators as false."

(Dkt. 14, p. 6.)  Again, during closing arguments, the State pointed to King's testimony to suggest

that Petitioner's statement about leaving the house at 8:00 or 8:30 p.m. could not have been correct.

(Id., pp. 500, 501.)  But Petitioner has not demonstrated that, absent this discrepancy in the time line

of events, the outcome of trial likely would have been different.  It is entirely speculative to assume

that even if King's testimony was shown to be inaccurate, the jury would have found credible the

remainder Petitioner's statement to law enforcement and believed his version of events.  Petitioner's

statements that he did not talk to Sonia Davis earlier or return to his own house before being arrested

were inconsistent with the testimony of Sonia Davis, Joshua Burton, and the numerous law

enforcement officers to whom they spoke, as well as the contents of Sonia's 911 call.

Accordingly, the record supports the state court's finding that Petitioner has failed to show

prejudice under *Strickland* because he does not demonstrate a reasonable probability that the

outcome of trial would have been different had counsel deposed King.  Petitioner has not

demonstrated that the state court's finding was contrary to or an unreasonable application of clearly

established federal law.  Consequently, Petitioner is not entitled to relief on Ground Two.

**Ground Three: "Deprivation of Rights Secured by the 6th and 14th Amendments,  Ineffective Assistance of Counsel, Failed to Object to State Impeaching his Own Witness."**

Petitioner argues that counsel was ineffective for failing to object when the State impeached

Sonia Davis, its own witness.[16]  Petitioner raised this claim in ground three of his Rule 3.850 motion.

---

[16]Within Ground Three, Petitioner makes general statements that Sonia Davis did not recall her past statements and that, under *Crawford v. Washington*, 541 U.S. 36 (2004), the defense had no chance to cross-examine Sonia Davis because she "was never available."  (Dkt. 1, p. 8.)  *Crawford* held that for testimonial hearsay statements of an unavailable declarant to be admissible, the defendant must have had a prior opportunity to cross-examine the declarant. *Id.* at 68.  To the extent that this assertion could be construed as a separate federal claim asserting that Petitioner's rights under the Confrontation Clause were violated through the introduction of Sonia Davis's out-of-court statements because she was unavailable and he had no opportunity to cross-examine her, the claim must fail.  In its order granting the use

He asserted that counsel was ineffective for failing to object to the State impeaching its witness.  In support of his claim, he referred to the State introducing Sonia Davis's grand jury testimony for purposes of impeachment.  (Dkt. 9. Ex. 18, p. 9.)  The state court summarily denied this ground:

> Defendant claims counsel was ineffective for not objecting to the impeachment of Sonia Davis with her grand jury testimony.  This claim is refuted by the record.  The State filed a motion to admit the testimony and a hearing was held.  After hearing, the Court granted the State's motion ... Counsel also renewed his objection to the use of the Grand Jury testimony. *Trial Testimony 169.*  Accordingly, this claim is denied.

(Dkt. 9, Ex. 19, pp. 5-6.)

The State anticipated that Sonia Davis would be reluctant to testify against Petitioner at

---

of Sonia Davis's grand jury testimony, the state court found that, because it anticipated that Sonia Davis would be present at trial and thus would not be "unavailable," her grand jury testimony would be admissible under *Crawford*. (Dkt. 9, Ex. 11, p. 2.) The state court found that Sonia Davis's 911 call and statements to Joshua Burton were admissible as excited utterances and did not invoke *Crawford* because they were non-testimonial. (Dkt. 9, Ex. 10, p. 5.) During trial, the court permitted Detective Medley to testify about Sonia Davis's statements to him under the hearsay exception for recorded recollections, and for purposes of impeachment. (Dkt. 9, Ex. 24, Vol. II, p. 271.)

Petitioner raised two claims on direct appeal arguing that Sonia Davis's out-of-court statements were improperly admitted. First, he asserted that it was error to introduce Sonia Davis's grand jury testimony and statements to police as impeachment material and as substantive evidence, because she did not remember the statements and was not available for cross-examination before or during trial. Petitioner also claimed that Sonia Davis's 911 call should have been excluded because it was a testimonial statement but she was unavailable for cross-examination. In bringing these claims, Petitioner asserted violations of both state and federal law. (Dkt. 9, Ex. 14, pp. 21-45.) Accordingly, inasmuch as Petitioner may be raising an independent claim that the use of Sonia Davis's out-of-court statements violated his federal constitutional rights, the claim is exhausted to the extent he raised it on direct appeal. When the state appellate court *per curiam* affirmed Petitioner's judgment and sentence, it considered and rejected these claims. This decision must be given deference under § 2254(d)(1). *Wright*, 278 F.3d at 1254. To the extent Petitioner may argue about the admissibility of this evidence under state law, his claim fails because a state court's interpretation of its own laws is not a basis for federal habeas relief. *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *McCullough v. Singletary*, 967 F.2d 530, 535 (11th Cir.1992). Furthermore, Petitioner does not demonstrate how he would be entitled to relief on his federal constitutional claim, because Sonia Davis testified at trial and was available for cross-examination concerning her previous statements and apparent difficulty with recalling the information. "[W]hen a declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." *Crawford*, 541 U.S. at 59, n.9. "[T]he Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Kentucky v. Stincer*, 482 U.S. 730, 739 (1987) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)); *see also United States v. Owens*, 484 U.S. 554, 560 (1988) ("[W]hen a hearsay declarant is present at trial and subject to unrestricted cross-examination ... the traditional protections of the oath, cross-examination, and opportunity for the jury to observe the witness' demeanor satisfy the constitutional requirements.").

trial.[17] Therefore, as the state court noted, the potential use of her out-of-court testimony and statements was addressed prior to trial.  The State filed a motion to admit Sonia Davis's excited utterances and grand jury testimony.  (Dkt. 9, Ex. 7.)  The trial court granted the State's motion to admit her grand jury testimony, and her excited utterances in the form of her 911 call and her statements to Joshua Burton.  (Dkt. 9, Exs. 10, 11.)[18]  The State's prediction about Sonia Davis's hesitation to testify was accurate, and the prosecutor often used her grand jury testimony and her statement to Detective Medley to impeach her when she answered that she did not know or did not recall, or when her answers were otherwise inconsistent with her prior statements.

During direct examination of Sonia Davis, counsel renewed his objection to the use of her grand jury testimony at the first instance of impeachment through her prior out-of-court statements.  (Dkt. 9, Ex. 24, Vol. I, p. 169.)[19]  Petitioner therefore agrees that counsel did object to the use of the

---

[17]The jury heard about steps taken to secure Sonia Davis's presence at trial due to her anticipated unwillingness to testify.  Detective Seltzer testified that Sonia evaded process servers and refuse to accept a subpoena to appear for trial.  (Dkt. 9, Ex. 24, Vol. II, p. 327.)  Detective Seltzer further testified that he ultimately obtained a material witness order and that Sonia Davis was arrested and informed by the court that she was required to appear and testify at trial. (Id., pp. 329, 330.)

[18]The state court initially denied the State's request to introduce Sonia Davis's statements to law enforcement as excited utterances.  ( Dkt. 9, Exs. 8, 10.)  However, at trial, the State impeached her with these statements.  Additionally, counsel objected to the introduction of Sonia Davis's statements through the testimony of Detective Medley when he testified. (Dkt. 9, Ex. 24, Vol. II, pp. 262, 265, 269.)  This request was denied and the statements were admitted under the hearsay exception for recorded recollections under § 90.803(5), Florida Statutes, and for impeachment purposes in some instances.  (Id., p. 271.)

[19]The following occurred when the State questioned Sonia Davis about her contact with Petitioner and Joe Wells during the afternoon of June 28, 2004:

Q       All right.  And while inside the home, inside Deborah Fossett's home, while you were talking and people were discussing certain things, was there any alcohol being served?

A       I think so.

Q       Were you drinking any alcohol?

A       I might have been.

grand jury evidence.  However, he asserts that the State was attempting to admit Sonia Davis's prior

statements as substantive evidence, and that is what counsel's objection involved.  Therefore, he

argues that counsel should have specifically objected on the basis that the state was improperly

---

Q       You might have been?

A       Yeah.

Q       Back on June 29th of 2004, do you remember telling us that you had a conversation, an interview with
        Detective Jim Medley, right?

A       Yes.

        [STATE]: Page 3 of that transcript, counselor.

Q       (By [State]) A question was asked of you by Detective Medley.  "Okay.  Were you drinking?  Did you
        have anything to drink?"
        And your answer was, "No I did not.  I did not.  I'm not going to sit here and lie.  If I did, I'd tell you."
        Jim Medley, "Okay."
        And your answer, "But I didn't."

A       I don't remember.

Q       Okay.  Let me ask you that.  Do you remember being asked that question and giving that answer?

A       Yes.

Q       If you gave that question and that answer, was that truthful?

A       Yes.

        [DEFENSE COUNSEL]: Judge, may we approach?

        THE COURT: You may.

(BENCH CONFERENCE.)
        [DEFENSE COUNSEL]: To make sure the record is protected, I'm renewing my objection to the use
        of the Grand Jury testimony in evidence in this case.  The Court previously ruled.  I wanted to renew
        my objections.

        THE COURT: So noted.

(Dkt. 9, Ex. 24, Vol. I, pp. 168-69.)

impeaching his own witness, and provides several points that he asserts counsel should have raised.[20] Petitioner contends that in its order denying his Rule 3.850 motion, the state court misapprehended his claim and failed to address his specific argument that counsel was ineffective for not objecting on the basis that the State was impeaching its witness.

Petitioner fails to show entitlement to relief.  As a preliminary matter, on appeal of the order denying his Rule 3.850 motion, Petitioner also alleged that the postconviction court misconstrued his claim, and that his argument actually was that counsel should have objected to the State's impeachment of its own witness, not just to the use of Sonia Davis's grand jury testimony.   (Dkt. 9, Ex. 22, pp. 4-5, 11.)  The state appellate court's *per curiam* affirmance indicates that it considered and rejected this assertion, and did not find any error that could sustain Petitioner's claim. Therefore, the appellate court concluded that Petitioner's argument was meritless.  That court's *per curiam* affirmance warrants deference under § 2254(d)(1).  *See Wright,* 278 F.3d at 1254; *Harrington,* 131 S.Ct. at 784–85.

Furthermore, Petitioner has not demonstrated that the postconviction court in fact misconstrued his argument.  The postconviction court stated in its order that "Defendant claims counsel was ineffective for not objecting to the impeachment of Sonia Davis with her grand jury testimony." (Dkt. 9, Ex. 19, p. 5.)  Therefore, while the court did not precisely recite Petitioner's claim, it recognized his contention that counsel should have objected to the State's impeachment of Sonia Davis, who was called as a State witness.  And as Petitioner noted in his Rule 3.850 motion,

---

[20] In his federal habeas petition, Petitioner cites *Senterfitt v. State*, 837 So.2d 599 (Fla. 1st DCA 2003) for the position that a party may not impeach its own witness if its only purpose in doing so is to introduce evidence that would otherwise be inadmissible.  Without naming *Senterfitt* in his Rule 3.850 motion, he raised this point and the factors for making such a determination as identified in that opinion.  (See Dkt. 9, Ex. 18, p. 11.)

this impeachment occurred partially through the use of Sonia Davis's grand jury testimony.   In

denying Petitioner's claim, the state court cited to the portion of the record where counsel objected

while the state began to impeach Sonia Davis and objected "to the use of the Grand Jury testimony

in evidence in this case."  *See supra*, note nineteen.

In this context, it is clear that counsel was objecting to the State's impeachment of its

witness.  The objection was not limited and did not exclude any particular purpose for which the

grand jury testimony was offered into evidence at trial.  Under these circumstances, is not apparent

that, as Petitioner claims, counsel was only making his objection in regard to the introduction of

Sonia Davis's grand jury testimony as substantive evidence.  The state court's phrasing of

Petitioner's postconviction claim, combined with its reliance on this portion of the record in denying

the argument, reflects that it recognized Petitioner's claim as he presented it.  Further, the more

specific assertion set forth by the state court, that counsel should have objected to Sonia Davis being

impeached with her grand jury testimony, invokes the broader overall claim that counsel should have

objected to the State's impeachment of its witness.  The state court set forth a fair representation of

Petitioner's argument, and its rewording of Petitioner's claim does not invalidate the basis for its

decision.

Moreover, Petitioner fails to demonstrate either deficient performance or resulting prejudice.

As counsel's statement suggests, he was renewing his objection to the court's earlier ruling on

evidentiary issues that were considered and addressed prior to trial.[21]  Although Petitioner argues that

---

[21]The State's motion to introduce Sonia Davis's grand jury testimony indicated that this testimony could be admissible for purposes of impeachment or as substantive evidence, and requested that it be admitted as substantive evidence.  (Dkt. 9, Ex. 7.)  The court's order permitting the use of the grand jury testimony did not specify the purpose or purposes for which it would be permitted.  (Dkt. 9, Ex. 11.)  Therefore, the court's order did not exclude the use of grand jury testimony for impeachment purposes.  Additionally, as one judge heard pre-trial evidentiary issues and a different judge presided at trial, it is speculative to suggest that the trial judge would have disturbed the ruling of the judge who considered the pre-trial motion and conducted a hearing on it.

counsel should have worded his objection differently, the fact remains that counsel timely objected

when the State impeached Sonia Davis, its own witness.  This is the very circumstance under which

Petitioner claims counsel should have objected.  Petitioner therefore fails to show deficient

performance.  Moreover, even assuming that a different objection would have been sustained and

that the State would have been prohibited from impeaching Sonia Davis, the crux of Sonia Davis's

testimony was also introduced through the testimony of Detective Medley when he told the jury

about her statements.  Therefore, Petitioner fails to show prejudice.

Petitioner does not show entitlement to relief.  The record supports the state court's

conclusion that counsel's performance was not deficient.  Accordingly, Petitioner has not

demonstrated that the state court's finding was contrary to or an unreasonable application of clearly

established federal law.  Ground Three warrants no relief.

**Ground Four: "Deprivation of Rights Secured by 6th and 14th Amendments.  Counsel was
Ineffective by Cumulative Effect of Deficiencies."**

Petitioner argues that he did not receive a fair trial because of multiple errors by counsel, and

that the cumulative effect of these errors therefore amounts to ineffective assistance of counsel.

Petitioner raised this claim in ground four of his Rule 3.850 motion, which the state court summarily

denied.  It found that "[a]s Defendant has failed to establish that counsel committed any errors,

Defendant's claim of cumulative error is without merit."  (Dkt. 9, Ex. 19, p. 6.)  Because he has not

shown that he is entitled to relief on any of his other ineffective assistance of counsel claims,

Petitioner cannot establish that the state court's denial of his cumulative error claim was contrary to

or an unreasonable application of established federal law.  *See Forrest v. Fla. Dep't of Corr.*, 342

Fed.Appx. 560, 564-65 (11th Cir. 2009).

Accordingly, it is

**ORDERED AND ADJUDGED** that Petitioner's petition for writ of habeas corpus (Dkt. 1)

is hereby **DENIED**. The Clerk is directed to enter judgment against Petitioner and close this case.

It is further ordered that Petitioner is not entitled to a certificate of appealability. A petitioner

does not have absolute entitlement to appeal a district court's denial of his habeas petition. 28

U.S.C. § 2253(c)(1). A district court must first issue a certificate of appealability (COA). *Id.* "A

[COA] may issue ... only if the applicant has made a substantial showing of the denial of a

constitutional right." *Id.* at § 2253(c)(2). To make such a showing, Petitioner "must demonstrate

that reasonable jurists would find the district court's assessment of the constitutional claims

debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529

U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to

proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*,

463 U.S. 880, 893 n. 4 (1983)). Petitioner has not made this showing. Because Petitioner is not

entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida, on *November 4th*, 2014.

JAMES D. WHITTEMORE
United States District Judge

SA:ml

<u>Copy furnished to:</u>
*Pro se* Plaintiff
Counsel of Record